LUTHER Y. MARTIN, FATHER, EDNA MARTIN, MOTHER OF VINCENT KEITH MARTIN, DECEASED, EMPLOYEE, PLAINTIFFS v. BONCLARKEN ASSEMBLY, EMPLOYER, EMPLOYERS COMMERCIAL UNION INSURANCE CO., CARRIER, DEFENDANTS

No. 26

(Filed 5 February 1979)

**Master and Servant § 60.4— workmen's compensation—death by drowning in lake during lunch hour—accident not arising out of and in course of employment**

The death of a fifteen-year-old laborer by drowning while swimming in a lake on his employer's premises during his lunch hour when the lifeguard was not on duty did not arise out of and in the course of his employment where he had been assigned on the day of his death to cut grass in an area at least one-half mile from the lake; deceased's body was found outside the chained area of the lake; deceased had not taken a swimming test; and rules posted in a place where one using the lake could not avoid seeing them permitted swimming in the lake before 4:30 p.m. only under the supervision of the lifeguard and permitted only those who had passed a swimming test given by the lifeguard to swim outside the chained area at any time, since all the evidence showed that deceased was acting in contravention of specific instructions from his employer and that he was engaged in an independent recreational activity totally unrelated to his work of cutting grass.

Justices BRITT and BROCK took no part in the consideration or decision of this case.

ON defendants' petition for discretionary review of the decision of the Court of Appeals reported in 35 N.C. App. 489, 241 S.E. 2d 848 (1978).

This proceeding is a claim by the next of kin, parents of Vincent Keith Martin (Vincent), deceased, for death benefits under the Workmen's Compensation Act, G.S. 97-40 (1972). Bonclarken Assembly (Assembly) is a conference and mountain resort area with about 90 cottages, a hotel, and various recreational facilities, among which is a 10-acre lake. The jurisdictional facts are stipulated and the uncontradicted evidence tends to show:

In the latter part of May 1974, the Assembly employed Vincent, a 15-year-old boy, as a laborer earning $2.00 per hour. Vincent was in the eighth grade, and he could read and write. His father, Claimant Luther Y. Martin, had been regularly employed by the Assembly for three or four years. Vincent's work was "mostly grass cutting with a handpush mower" in places where the tractor mowers could not go. He would work between six and forty hours per week depending upon how long he chose to work. He, like all Assembly employees, had an hour for lunch, during which time he was on his own. Employees were not paid for the lunch hour, but had the choice of eating a free lunch in the hotel dining room or going elsewhere.

With reference to the Assembly's recreational facilities G. H. Jones, "the Supervisor in charge of maintenance," told his employees, including Vincent, that they were free to use the gym and the tennis courts during their lunch hour "when they weren't actually on the payroll." The employees often used these facilities after lunch. Supervisor Jones testified, however, that he had never given the employees any instructions about swimming in the lake because the subject, "never came up."

The swimming area of this lake, marked by a buoy-supported rope, included a pier with a diving board at the end of it, a sliding board, two rafts anchored in deep water, and a small, shallow chained-in area in which the water was from two inches to three feet deep. The lake was regularly closed for lunch, and the lifeguard would put his life-saving equipment in the storage room to indicate that the lake was closed. (The resident director of the Assembly testified that this was done to remove all evidence that the lake was open and to prevent anyone's assuming that the

lifeguard might be there.) Regulations governing the use of the lake, which had been in effect several years, were imprinted on a large sign composed of four boards in alternate colors of yellow, white, and black. This signboard confronted all persons who crossed the footbridge, which was the only access to the lake unless · one waded the creek at the far end of the lake. In big letters and numerals of contrasting color, the signboard stated:

LAKE REGULATIONS

MONDAY — SATURDAY, Swimming and boating under supervision of lifeguard until 4:30 p.m.

MONDAY — SATURDAY, Swimming ONLY 5:00 p.m. — 7:00 p.m. AT YOUR OWN RISK.

SUNDAY ONLY, Lake open from 2:00 — 5:00 p.m. under supervision of lifeguard.

SWIMMING TEST BY LIFEGUARD REQUIRED FOR SWIMMING BEYOND CHAINED AREA.

On 30 July 1974 Vincent was instructed to mow grass near the front gate of the Assembly which was about one-half mile from the lake. On that day the lunch hour for employees at the Assembly hotel, which varied from day to day, was from 11:30 to 12:30. About 11:25 Jones saw Vincent at the shop where the boys usually "cleaned up" before going to the dining room for lunch, and it was Jones's impression that Vincent was getting ready to eat lunch. About noon, however, Mary Jo Yeager, an Assembly employee who had skipped lunch to sun bathe on the lake pier saw Vincent approach the lake. The lifeguard had gone to lunch, and she and Vincent were the only persons in the area. As he passed they each said "hi" and that was all.

Miss Yeager watched Vincent wade into the shallow area of the lake and then come out and walk to the sliding board. Thereafter she saw him jump or dive from the bottom of the sliding board into the deep area and swim toward a raft. She had never before seen Vincent in the lake. When he was about two feet from the raft she heard him call for help. She thought he was "kidding" until she looked back and found he was nowhere to be seen. She swam toward the raft and started diving in eight feet of water searching for him. Being unable to find him she went to

the nearest cottage and summoned the lifeguard. He came quickly and retrieved the body. The death certificate recites that Vincent died by accidental drowning at 12:45 p.m. on 30 July 1974.

The lifeguard, David Kilmer Romine, testified in substance as follows:

He knew Vincent and had talked to him once or twice while he was on duty. Romine was having lunch at the hotel when he received the emergency call to come to the lake. When he arrived he found Vincent's body in the deep area outside the chain. The posted swimming regulations applied to everyone — employees as well as Assembly guests: Swimming before 4:30 p.m. was permitted only under the supervision of the lifeguard and only those who had passed a swimming test given by the guard were allowed to swim outside the chained area at any time. Vincent had never taken the swimming test and the guard had not given him permission to swim on 30 July 1974.

Vincent's twin brother, Kenneth, testified that prior to 30 July 1974 to his knowledge his brother had never gone swimming in the lake.

The Industrial Commission found facts consistent with the evidence detailed above and concluded as a matter of law that Vincent's death by drowning arose out of and in the course of his employment. The Commission awarded claimants compensation under G.S. 97-2(5). Defendants appealed to the Court of Appeals and in an opinion by Judge Webb the Court of Appeals affirmed the award. Upon defendants' petition we allowed discretionary review. G.S. 7A-31(a) (1969).

*George W. Moore for plaintiff appellee.*

*Morris, Golding, Blue and Phillips for defendant appellant.*

SHARP, Chief Justice.

The question this appeal presents is whether the evidence before the Industrial Commission is sufficient to support its findings and conclusion that Vincent Martin's accidental death by drowning resulted from an accident *arising out of* and *in the course of* his employment. G.S. 97-2(6) (1972); *Keller v. Waring Co.,* 259 N.C. 222, 130 S.E. 2d 342 (1963); *Henry v. Leather Co.,* 231

N.C. 477, 57 S.E. 2d 760 (1950). These two italicized phrases are not synonymous; they "involve two ideas and impose a double condition, both of which must be satisfied in order to bring a case within the Act." *Robbins v. Nicholson*, 281 N.C. 234, 238, 188 S.E. 2d 350 (1972).

An injury arises out of employment when it is the result of a condition or risk created by the job. The words "in the course of," as used in G.S. 97-2(6), refer to the time, place and circumstances under which the accident occurred. "An accident arises out of and in the course of the employment when it occurs while the employee is engaged in some activity or duty which he is authorized to undertake and which is calculated to further, directly or indirectly, the employer's business." *Perry v. Bakeries Co.*, 262 N.C. 272, 274, 136 S.E. 2d 643 (1964). *See Bell v. Dewey Brothers, Inc.*, 236 N.C. 280, 72 S.E. 2d 680 (1952); Thorpe, *Workmen's Compensation, Survey of North Carolina Case Law*; 45 N.C.L. Rev. 983, 992-995 (1967).

Claimants assert that it would be the "natural inclination of a 15-year-old boy after a morning of hard work on a hot day to desire to avail himself of the opportunity to swim in the Assembly lake during his lunch break"; that the "accidental drowning was a hazard or risk of his employment because of the nature of his work [cutting grass] and the availability of [the lake] to the deceased"; and therefore that "deceased's drowning 'arose out of' his employment because the employment was a condition contributory to his drowning."

Quoting from *Watkins v. City of Wilmington*, 290 N.C. 276, 283, 225 S.E. 2d 577, 582 (1976) (a case factually dissimilar to instant case), claimants argue that "where competent proof exists that the employee understood or had reasonable ground to believe that the act resulting in injury was incidental to his employment, or such as would prove beneficial to his employer's interests or was encouraged by the employer in the performance of the act or similar acts for the purpose of creating a feeling of good will, or authorized so to do by common practice or custom, compensation may be recovered, since then a causal connection between the employment and the accident may be established." The difficulty with this argument, however, is that the record contains no evidence which will support its application to the

present case. On the contrary, all the evidence negates such an application.

As heretofore noted, the evidence was uncontradicted and tends to show that the supervisor of maintenance, under whom the grass-cutters worked, had specifically authorized them to use only the gym and the tennis courts during nonworking hours. As to swimming in the lake, he said, "that never came up" and he had never given "the boys" instructions either way. Notwithstanding, the rules governing the use of the lake applied to all persons who used the lake, guests and employees alike, and these rules were posted at a place where no one who could read could avoid seeing them. Vincent's twin brother, who ordinarily worked with him every day, testified that he had never been specifically instructed as to these rules, but it was his understanding that the lake was closed while the lifeguard was eating lunch; and that until after 4:30 p.m. swimming was allowed only when the lifeguard was on duty. He testified further that, to his knowledge, pior to the day of Vincent's death he had never gone swimming in the lake. It is significant, we think, that no witness testified he had ever seen Vincent in the lake.

The lifeguard testified that he knew Vincent; that he had seen him at the lake, and had talked to him while he was on duty; that no one who had not taken a swimming test given by the lifeguard was permitted to swim outside the chained-in area, and this regulation was posted on the sign "located near and facing the foot bridge that everybody had to use to get into the lake." The guard also said that "the deceased never did take the swimming test."

From the foregoing recital it is implicit in this evidence—indeed, it will support no other inference—that when deceased jumped into the deep water of the lake during his lunch hour on 30 July 1974, at a time when the lifeguard was at his lunch, deceased was acting outside the scope of his employment, in contravention of specific instructions from his employer, and that he had no reasonable grounds to believe otherwise. He was engaged in an independent recreational activity, totally unrelated to his work of cutting grass. On the day of his death he was assigned to cut grass in an area at least one-half a mile from the lake. The risk of his drowning during the lunch hour in a lake he

was forbidden to enter at that time was a risk foreign to his employment. In short, deceased's accidental drowning was neither a natural and probable consequence nor an incident of his employment; there was no causal relation between his death and the performance of any service calculated to further the business of the Assembly either directly or indirectly. *Perry v. Bakeries Co.*, 262 N.C. 272, 136 S.E. 2d 643 (1964).

As noted in 1A Larson's Workmen's Compensation Law § 21.21(d) (1978) ". . . there is no magic in being on the [employer's] premises, if the employee is injured by getting into places where he has no right to go." Neither a minor nor an adult claimant can recover under the Workmen's Compensation Act when he "does acts different in kind from what he is expected or required to do, which are forbidden and outside the range of his service." *Radtke Bros. v. Industrial Commission*, 174 Wis. 212, 217, 183 N.W. 168, 170 (1921). The circumstances of this case preclude the application of the "personal comfort doctrine." *See Larson, supra*, § 21.

Upon the undisputed facts of this case we hold as a matter of law that the death of Vincent Keith Martin did not arise out of and in the course of his employment. *Perry v. Bakeries Co., supra; Matthews v. Carolina Standard Corp.*, 232 N.C. 229, 60 S.E. 2d 93 (1950).

The decision of the Court of Appeals affirming the award of the Industrial Commission is reversed, and this proceeding is returned to that Court for remand to the Commission for the entry of an order in accordance with this opinion denying compensation.

Reversed.

Justices BRITT and BROCK took no part in the consideration or decision of this case.