The undersigned have reviewed the Award based upon the record of the proceedings before the Deputy Commissioner.
The appealing party has shown good grounds to reconsider the evidence in this case. Neither party here requested the Full Commission to receive further evidence or to rehear the parties. The Full Commission, in their discretion, have determined that there are no good grounds in this case to receive further evidence or to rehear the parties, as the sole issue for review involves defendants' right, or lack thereof, to a subrogation interest or lien on amounts collected by plaintiff in a third party settlement. (N.C.G.S. 97-10.2). The Full Commission are of the opinion that the Deputy Commissioner erred in his finding of a subrogation interest for defendants. Accordingly, the Full Commission reject and replace Conclusions of Law #11 through 13 and subsequently make their own ultimate award.
At the initial hearing, the parties submitted and the Deputy Commissioner received for the record a Pre-Trial Agreement. Based on stipulations made at the hearing and in the Pre-Trial Agreement, the undersigned find as fact and conclude as matters of law the following, as
STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act, the defendant employer regularly employing three or more employees.
2. At all times hereinafter in question, Universal Underwriters Group was and is the Workers' Compensation carrier for Harley-Davidson of Metrolina, Inc., as defined by North Carolina General Statute, Section 97-2.
3. On June 1, 1990, the plaintiff was employed as a motorcycle mechanic for Harley-Davidson of Metrolina, Inc., and had been so employed since September 5, 1989.
4. On May 31, 1990, plaintiff was permitted by Harley-Davidson of Metrolina, Inc., to take a customer's motorcycle home and keep it overnight.
5. Plaintiff was scheduled to work at Harley-Davidson of Metrolina, Inc. on June 1, 1990.
6. As a result of a collision, June 1, 1990, plaintiff suffered severe injuries, including a fracture of his right hip, and left Grade III open foot fracture.
7. On June 1, 1990, plaintiff earned an average weekly wage of $509.53 in his employment with Harley-Davidson of Metrolina, Inc. (This yields a compensation rate of $339.68).
8. Plaintiff has asserted a third party claim against Angela Michelle Wilburn and Eugene Earl Wilburn for the injuries which are the subject of this hearing. On November 16, 1990, a Consent Order for Judgment in the amount of $25,000.00 in the favor of the plaintiff, David Eugene Radzisz, was entered. In consideration for such Consent Order, the parties herein and the third party agreed that "in order to accommodate the potential workers' compensation lien on the proceeds of the civil action, Mr. Radzisz, Harley-Davidson of Metrolina, Inc. and Universal Underwriters Group hereby execute this stipulation and agreement whereby Mr. Radzisz stipulates that if his worker's compensation claim is upheld by the Industrial Commission or if Harley-Davidson of Metrolina, Inc. and Universal Underwriters Group write a written admission of liability for benefits with the Commission, Harley-Davidson of Metrolina, Inc. and Universal Underwriters Group will have a lien, as provided in N.C.G.S. Section 97-10.2
against these proceeds and stipulates that they will be entitled to a credit against the worker's compensation benefits to the extent they have a subrogation interest in the proceeds of the settlement of the civil action. The amount of the subrogation interest is to be determined as if the civil action were settled after the total amount of the worker's compensation lien is determined by the Industrial Commission or Court and is to be determined in accordance with N.C.G.S. Section 97-10.2. The parties specifically reserve the right to contest the issue of the amount of the lien". Further, the agreement read: "[t]he purpose of this agreement is to protect the potential subrogation interest, if any, of Harley-Davidson of Metrolina, Inc. and Universal Underwriters Group. As of the date of execution of this agreement, David Radzisz contends that no such interest exists in this case. This agreement is not to be construed as granting or conceding the existence of any potential subrogation interest until Mr. Radzisz's workers' compensation claim is honored. David Radzisz reserves all rights under N.C.G.S. 97 and N.C.G.S. 97-10.2
to contest the amount of the subrogation interest before the Industrial Commission or a Court of appropriate jurisdiction." A copy of said settlement stipulation was attached as Exhibit A to the Pre-Trial Agreement and has been marked and included in the record as Stipulated Exhibit A.
9. The parties agreed that the issues for the hearing are as follows:
 (a) Did the claimant, David Eugene Radzisz's injuries arise out of and in the course of his employment with Harley-Davidson of Metrolina, Inc. as defined by North Carolina General Statutes, Section 97-2 (6)?
 (b) What is the extent of the employee's disability, if any, under the provisions of the Act?
 (c) If it be determined that the claimant is entitled to benefits under Chapter 97 of the North Carolina General Statutes, to what extent, if any, is Harley-Davidson of Metrolina, Inc. and Universal Underwriters Group entitled to a lien against the third party recovery?
The parties submitted for the record Stipulated Exhibits #1 through #21, the first four of which are the medical records respectively of Carolinas Medical Center, University Memorial Hospital, Miller Orthopedic Clinic, and Charlotte Mecklenburg Ambulance Service. Stipulated Exhibits #5 through #21 are medical bills for plaintiff's treatment totalling $40,744.41.
Subsequent to the hearing, the parties stipulated that the medical notes of Dr. David Dupuy could be received for the record. They have been marked as Stipulated Exhibit #22.
On July 28, 1991 the parties deposed Dr. Thomas J. Moore, an orthopedic surgeon. The transcript of the deposition has been received for the record. No exhibits are attached to the transcript. Objections made at the deposition are overruled.
* * * * * * * * * *
The Full Commission adopt as their own all findings of fact found by the Deputy Commissioner, as follows:
Based on all the competent and convincing evidence of record, the undersigned make the following additional
FINDINGS OF FACT
1. Plaintiff, 32 years of age at the time of his accident, received a General Equivalency Diploma while serving in the United States Army in 1977. Thereafter, he was engaged in construction work at various times, and also had received advanced training in motorcycle mechanics at three different institutes, one of them defendant employer's factory institute. Plaintiff had spent most of his recent years in Florida and came to North Carolina only to accept employment with defendant. At the time of the hearing, plaintiff resided in Florida and did not intend to return to North Carolina.
2. On June 1, 1990 plaintiff had been employed by defendant approximately nine months as a motorcycle mechanic. All of plaintiff's work was performed at the employer's shop on South Tryon Street in Charlotte. Motorcycles brought to the employer's shop for repairs were assigned to one of several mechanics by Al Silver, the service manager. Once assigned, a motorcycle became the responsibility of the mechanic to repair. Mechanics were compensated at a flat rate for their work by reference to a rate book, which stated a specified amount of allowable time for each repair procedure. They were paid for the time shown in the rate book, without regard to whether the actual time spent repairing a motorcycle was more or less than stated in the book. The purpose of this compensation arrangement was to encourage mechanics to do the work correctly the first time.
3. Each mechanic furnished his own tools but had access to certain shop equipment, including work benches, rolling stools, lathes, etc. Each mechanic was assigned a service bay. The service bays were equipped with lifts to raise and lower motorcycles to the desired height for repairs. There were hoists to handle any heavy lifting. According to Silver, mechanics seldom lifted more than 25 pounds, and most lifting was significantly less than 25 pounds.
4. Sometime prior to June 1, 1990, a customer, Caldwell, brought his motorcycle to the employer's shop, because it was smoking. The motorcycle was assigned to plaintiff for repairs. On his first attempt at repairing the motorcycle, plaintiff replaced the exhaust valves and guides. He was paid according to the rate book for that work. The motorcycle was returned by Mr. Caldwell for the same problem, smoking, and plaintiff installed new rings. Plaintiff was not paid for that work, because he had already been paid pursuant to the rate book for the time needed to fix the motorcycle on the first attempt. Caldwell returned the motorcycle a third time, because it was smoking worse than before repairs were attempted. Plaintiff again tried to repair the motorcycle. Plaintiff was not paid for the additional work, since he had already been paid once for the time necessary to repair the motorcycle. After his first attempt at repairing the motorcycle, plaintiff was on his own time. The employer was not paid anything for the additional time plaintiff worked on the motorcycle.
5. Silver expected his mechanics to test drive motorcycles following any major repairs. According to Silver, 90 percent of such "test driving" was done by driving around the block where the shop was located; but, while not common, on occasion test drives of five miles or more were necessary. Plaintiff test drove Caldwell's motorcycle around the block the first two times it was in the shop. Silver admitted on direct examination by plaintiff that road testing is to the customer's, the shop's, and the mechanic's benefit. It is a good business practice to see that no repairs are left undone or incomplete. Road testing, he said, is appropriate if the mechanic feels it is necessary.
6. On May 31, 1990 (the third round of repairs) plaintiff replaced the intake valves and guides on Caldwell's motorcycle. These repairs were of a type that normally would be road-tested. During working hours that day, plaintiff test drove the vehicle around the block but the smoking did not clear up. He put the motorcycle aside for a while and worked on another customer's bike. Plaintiff believed that still more road tests on the Caldwell motorcycle might be helpful. He wanted the new parts he had installed to "seat up".
7. As a result of a conversation with Silver near quitting time (and as stipulated in the Pre-Trial Agreement) plaintiff took Caldwell's motorcycle home and kept it overnight May 31, 1990. (Mechanics were not allowed to use customers' vehicles after working hours without permission of their supervisors). The conversation described was initiated by Silver, and not by plaintiff. The undersigned will not indulge in the word games of the parties, who quibbled at length at the hearing and on brief over whether Silver directed, instructed, suggested, ordered, etc. this course of action. The fact remains that Silver told plaintiff to take the motorcycle home, put some extra miles on it and bring it back the next morning, to see if it would stop smoking. This constituted permission and authority for plaintiff to leave the premises on Caldwell's motorcycle after working hours.
8. Nor does the undersigned accept Silver's year-old hindsight recollections at the hearing that he personally didn't think more road testing was necessary, but had left that to plaintiff's discretion. As the parties stipulated, Silver gave permission to plaintiff to take the bike home and keep it overnight, and his afterthoughts about the wisdom or necessity of the decision to have further test driving are immaterial. Moreover, the undersigned does not accept the further hindsight of Silver that he was really trying to serve plaintiff's convenience by providing him a means of getting back and forth to work; plaintiff already had a means of getting home and back, because for two weeks he had been given a ride every day by Turner, a fellow employee, while his own vehicle was being repaired. Despite her claimed growing annoyance with the arrangement, there is no indication Turner was not expecting to continue this pattern the night of May 31; and it was only after Silver told him to ride the motorcycle home that plaintiff told Turner he did not need a ride home with her that night.
9. Plaintiff rode Caldwell's motorcycle straight to his home off Statesville Road in North Charlotte, on the night of May 31. He did not use the motorcycle after reaching home. The next morning he had breakfast at his home and left about 8:40 a.m., which was about twenty minutes before his workday was to begin at defendants' shop. The normal route from plaintiff's home was to come down Statesville Road to I-85, take I-85 South to I-77, and south on I-77 to defendants' shop.
10. The morning of June 1, since he was trying to put extra miles on the motorcycle to see if it would stop smoking, plaintiff went north instead of south on Statesville Road to Sunset Road. He planned to follow Sunset to I-77 and then to the shop. He made no stops after he left his home. His accident occurred about five minutes after he left home, in front of a McDonald's Restaurant on Sunset. Ms. Turner estimated that the scene of the accident was one and a half to two miles away from plaintiff's home. If plaintiff's use of the Sunset Road route to I-77 were a deviation or detour (instead of an alternate route to defendants' shop, as the undersigned concludes) it was a minor deviation from plaintiff and Turner's accustomed route.
11. Defendants' repeated suggestions that plaintiff had personal reasons for that "deviation" are purely speculative, unfounded in the record. The fact that plaintiff asked Turner during their previous travels to make stops along the way for his convenience is not only irrelevant, in that it proves nothing about plaintiff's intentions June 1; but the inference arises that the personal stops Turner made for plaintiff on previous days were made on the direct route between Statesville Road and defendants' shop, and if plaintiff had similar errands on his mind that morning, there would have ben no need to turn north on Statesville Road. If (contrary to his own testimony that he ate breakfast at his trailer home) plaintiff intended to stop for breakfast before reporting to work, it is a permissible inference that many eating establishments were open along the previously used route. Again, there would have been no reason for plaintiff to take a different or longer route for this purpose.
12. The only plausible reason for driving north on Statesville Road and on to Sunset, is the one plaintiff offered, that he wanted to test drive Caldwell's motorcycle for extra miles to determine whether it was still smoking and whether the new parts had "seated". Regardless of the fact that neither defendant nor plaintiff received extra monies from further test drives of this vehicle, the road test June 1 would have inured to the benefit of both, and to the customer, first, because Caldwell's patience was doubtless rapidly expiring due to the repeated troubles with his vehicle, and the sooner the smoking problem was cured, the customer's satisfaction would be complete; and, likewise, the sooner the problem was remedied, the more time plaintiff on his return to the shop could devote to repair projects which would generate income for himself and his employer. Thus there were recognizable benefits to the defendant employer from plaintiff's planned further road work with Caldwell's motorcycle the morning of June 1, and from the test driving plaintiff accomplished up to the time of his accident.
13. Following the collision in which plaintiff was struck broadside by Ms. Wilburn's auto, plaintiff was transported to Carolinas Medical Center and came under the care of Dr. Moore for the injuries to his left foot and his right hip. Dr. Moore noted on July 5, 1990 that plaintiff's foot wound was fully healed. By August 1, plaintiff was fully ambulatory. On August 22, 1990, plaintiff had multiple complaints relating to his head and neck, but these problems were not related to the accident in question. On October 9, plaintiff had significant pain in his left foot. Plaintiff failed to keep a scheduled appointment on October 26, 1990. He had moved to Florida at that time to live with a friend. Plaintiff did not return to Dr. Moore's office until April 24, 1991, at which time he was doing extremely well. Plaintiff could have returned to work on that date as a motorcycle mechanic, with the only restriction being standing for longer than four to six hours without periods of rest. Dr. Moore was not aware that plaintiff had a rolling stool available to work form and that lifts were used for the motorcycles.
14. According to Silver, plaintiff's work involved standing less than 60 percent of the time, and the amount of standing time could be further reduced by using stools and other available equipment.
15. Dr. Moore rated plaintiff as having a ten percent permanent partial disability of the right leg and 20 percent permanent partial disability of the left foot. (Dep. Tr. 17).
16. As of April 24, 1991, plaintiff's left foot had some intermittent swelling, but the soft tissue wound was entirely healed. X-rays revealed satisfactory healing with post-traumatic arthrosis in the tarsol-metatarsal joints. Dr. Moore believed that plaintiff will most likely have swelling and stiffness in his left foot, and significant pain in his left foot, which may preclude him from certain activities. He will have some difficulty walking for prolonged periods of time. The implant in his right hip, which has healed, may require removal at a later date. Further fusion surgery on his foot may also be required in the future.
17. Plaintiff was also seen by Dr. David N. Dupuy for an independent medical examination. Dr. Dupuy rated plaintiff's permanent partial disability at five percent of the right leg and 15 percent of the left foot. Dr. Dupuy authorized plaintiff to return to work as a mechanic two to four hours per day to increase to six hours per day and eventually eight hours per day.
18. Plaintiff reached maximum medical improvement of his hip April 24, 1991, and of his foot August 6, 1991.
19. There was work available for plaintiff within his restrictions on April 24, 1991, when Dr. Moore released plaintiff to return to work. There was also work available at the time of the hearing on June 26, 1991. Plaintiff never returned to work or contacted the employer about employment. Plaintiff's mother came by the shop a few days after plaintiff's accident and collected his tools. Plaintiff then moved to Florida without leaving an address or telephone number where he could be reached. Plaintiff's attorney specifically instructed him not to contact the employer for any reason.
20. As a result of his injury by accident, plaintiff was unable to earn wages in any employment between June 1, 1990 and April 24, 1991, and retains a permanent partial impairment of ten percent of his right leg and 20 percent of his left foot.
21. The treatment afforded plaintiff as exemplified by the stipulated medical bills was reasonably required to afford plaintiff relief from his injury and tended to lessen his period of disability. Future medical treatment of his leg and hip may be required.
22. Because Dr. Moore was the treating physician who saw plaintiff many times after his accident, his opinions are entitled to greater weight than Dr. Dupuy, who saw plaintiff only once.
* * * * * * * * * * *
Based upon the findings of fact as found by the Deputy Commissioner and adopted by the Full Commission, the Full Commission find as follows:
CONCLUSIONS OF LAW
1. Defendants have on brief correctly stated general principles of law, to the effect that is well settled that to be compensable under the Workers' Compensation Act, an injury must occur by accident and arise out of and in the course of the employment.Withers v. Black, 230 N.C. 428, 53 S.E.2d 226 (1949). The phrase "arising out of and in the course of employment" encompasses two distinct concepts, both of which must be satisfied in order for an injury to be compensable. Harless v. Flynn, 1 N.C. App. 448,162 S.E.2d 47 (1968). "An injury arises out of employment when it is the result of a condition or risk created by the job".Martin v. Bonclarken Assembly, 296 N.C. 540, 152 S.E.2d 403
(1979). Stated differently, an accident arises out of the employment when it comes from the work the employee is to do, or out of the services he is to perform, and as a natural result of the risks of the employment. Bolling v. Belk-White Co., 228 N.C. 749,46 S.E.2d 838 (1948). The words "in the course of" refer to the time, place and circumstances under which the accident occurred. Martin v.Bonclarken Assembly, supra.
2. However, contrary to the defendants' contentions, the evidence establishes that on June 1, 1990, plaintiff's injury by accident did arise out of and in the course of his employment with defendant. G.S. 97-2 (6). It is clear that test-driving (or road-testing), on the streets and highways of Charlotte, vehicles brought to defendant for repair, was not only a regular, but an expected incident of defendants' business and one which admittedly benefits defendant and its customers. The fact that the accident occurred away from the employer's work place and outside working hours in this case is of no significance. Time and place do not necessarily mean the regular hours of employment and on the employer's premises. If the employee is doing work at the direction and for the benefit of the employer, the time and place of work are for the benefit of the employer and a part of the employment of the employee. Brown v. Jim Brown's Serv. Station,45 N.C. App. 255, 262 S.E. 700 (1980). Where the employee is engaged in activity which he is authorized to undertake and whichis calculated to further, directly or indirectly, the employer'sbusiness, the circumstances are such as to be within the course of employment. Harless v. Flynn, supra; Smith v. Central Transp.51 N.C. App. 316, 276 S.E.2d 751 (1981); Watkins v. City ofWilmington, 290 N.C. 276 (1976); Lee v. Henderson Associates,284 N.C. 126 (1973); Guest v. Iron Metal Co., 241 N.C. 448
(1955).
3. As to the "arising out of the employment" test, under the rule of causal relation, this test is satisfied (as here) when the accident is the result of a risk involved in the employment or incident thereto, or to the conditions under which it is required to be performed. Bolling v. Belk-White Co., supra; Perry v.American Bakeries Co., 262 N.C. 272, 136 S.E.2d 642 (1964). Test driving a motorcycle at any time exposes plaintiff and other mechanics employed by defendant to the risk of a collision with an automobile on the public streets or highways. Plaintiff's injuries were a natural result of that risk when it materialized.
4. Inasmuch as plaintiff was not permitted to use Caldwell's motorcycle in whole or in part to provide him transportation home, the "dual purpose" doctrine need not be considered here. The "detour" and "special errand" cases are not applicable here, because plaintiff did not deviate from his assigned task to put "extra miles" on Caldwell's motorcycle; he was not involved in a personal errand. He merely chose a longer route to defendant's shop to accomplish that task. Cf. Deal v.Pilot Life Insurance Co. 20 N.C. App. 30, 200 S.E.2d 420 (1973);Warren v. City of Wilmington, 43 N.C. App. 748, 259 S.E.2d 786
(1979).
5. Even if Silver is to be believed when he testified that plaintiff was to bring the bike "straight back" or "directly back" to the shop, disregard of the employer's instructions is not fatal to plaintiff's claim. Engaging in an activity which is outside the narrow confines of the employee's job description, but is reasonably related to the accomplishment of the task for which the employee was hired, does not ordinarily constitute a departure from the scope of employment. Hoyle v. Isenhour Brick Tile Co.supra. Cf. Riddick v. Richmond Cedar Works, 227 N.C. 647,43 S.E.2d 850 (1947).
6. If an employee does something which he is not specifically ordered not to do, and the thing he does furthers the business of the employer although it is not a part of the employee's job, an injury sustained by accident while he is so performing is in the course of employment. Parker v. BurlingtonIndustries, 78 N.C. App. 517, 337 S.E.2d 589 (1985). If there were alternate routes to defendant's shop from plaintiff's home, as anyone familiar with street patterns in Charlotte knows to be the case, to contend that plaintiff was not coming "straight" from his home while he was on Sunset Avenue is to indulge in mere word play.
7. As a result of his compensable injury of June 1, 1990, plaintiff is entitled to compensation for temporary total disability from June 1, 1990 to April 24, 1991, a period of 46 and six-sevenths weeks. G.S. 97-2 (9); G.S. 97-29. The weekly rate of compensation is 66 and two-thirds percent of his average weekly age. ($339.68).
8. As a further result of his compensable injury, plaintiff is entitled to compensation for 20 weeks at a rate of sixty six and two-thirds percent of his average weekly wage for the ten percent permanent impairment of his right leg. G.S. 97-31 (15).
9. As a further result of his compensable injury, plaintiff is entitled to compensation for 28.8 weeks at a rate of sixty six and two-thirds percent of his average weekly wage for the 20 percent permanent impairment of his left foot. G.S. 97-31 (14).
10. Plaintiff as a result of his compensable injury is entitled to the benefits of G.S. 97-25, including such future expenses for medical treatment as are reasonably required to afford him relief from his injury, including relief from pain.
11. Defendants claim a subrogation interest pursuant to N.C.G.S. 97-10.2, based upon a stipulation by the parties in paragraph 9 of the Pre-Trial Agreement, and Exhibit A thereto, which read that the defendants here "will have a lien, as provided in N.C.G.S. Section 97-10.2 against [the] proceeds [of a $25,000.00 settlement with the third-party tort feasor incorporated in a November 16, 1990 consent judgment], and [Mr. Radzisz] stipulates that they will be entitled to a credit against the workers' compensation benefits to the extent they have a subrogation interest in the proceeds of the settlement of the civil action. The amount of the subrogation interest is to be determined as if the civil action were settled after the total amount of the workers' compensation lien is determined by the Industrial Commission . . . and is to be determined in accordance with N.C.G.S. Section 97-10.2. The parties specifically reserve the right to contest the issue of the amount of the lien."
Further, the agreement read: "[t]he purpose of this agreement is to protect the potential subrogation interest, if any, of Harley-Davidson of Metrolina, Inc. and Universal Underwriters Group. As of the date of execution of this agreement, David Radzisz contends that no such interest exists in this case. This agreement is not to be construed as granting or conceding the existence of any potential subrogation interest until Mr. Radzisz's workers' compensation claim is honored. David Radzisz reserves all rights under N.C.G.S. 97 and N.C.G.S. 97-10.2 to contest the amount of the subrogation interest before the Industrial Commission or a Court of appropriate jurisdiction."
This settlement stipulation was entered into on November 9, 1990.
N.C.G.S. 97-10.2 (f) (1) provides that:
 "[i]f the employer has filed a written admission of liability for benefits under this Chapter with, or if an award final in nature in favor of the employee has been entered by the Industrial Commission, then any amount obtained by any person by settlement with, judgment against, or otherwise from the third party by reason of such injury or death shall be disbursed by Order of the Industrial Commission . . ."
As defendants did not admit liability for this injury and instead denied and contested liability, and as no final award has been entered by the Industrial Commission, defendants shall have no subrogation interest or lien as to the $25,000.00 third party settlement.
12. The settlement stipulation entered into by the parties does not purport on its face or otherwise to create a subrogation interest as agreed to by the parties. Instead, it merely purports and preserves any such interest as defendants may have eventually been found to exist. It was explicitly noted that the issue was still to be contested. Further, N.C.G.S. 97-10.2's requirements, and not any stipulated agreement to another effect by the parties, controls this matter.
Accordingly, defendants are not entitled to any subrogation interest in the third party settlement of $25,000.00.
13. It is not a matter of record whether the consent judgment contained any reference to attorney's fees. (The consent judgment was attached to plaintiff's brief, but was not included in Exhibit A attached to the Pre-Trial Agreement or elsewhere in the record). The undersigned cannot determine whether plaintiff'sattorneys received a fee from the $25,000.00 proceeds of the thirdparty settlement.
* * * * * * * * * * *
Based upon these conclusions of law, the Full Commission amend the Award as follows:
AWARD
1. The total amount of compensation due plaintiff for his compensable injury is $32,492.78, representing $15,916.40 in compensation for temporary total disability, $6,793.60 in compensation for permanent partial disability of his left leg, and $9,782.78 in compensation for permanent partial disability of his right foot.
The preparation of this Award is complicated by the inadequacies of the record as indicated, and by the fact that the parties agreed to disburse the proceeds of the third party settlement long before the Commission made an Award. There is nothing left for the Commission to "order" disbursed as the statute requires. It is also recognized that plaintiff may have spent the $25,000.00 proceeds without paying any attorneys' fee.
2. Reasonable attorneys' fees for plaintiff's attorneys are one third of the $25,000.00 proceeds of the third party settlement; and, in accordance with Industrial Commission practice, 25 percent of the net workers' compensation recovery of $32,492.78. The respective amounts are $8,333.33 and $8,123.20.
3. Defendants are not entitled to any credit against the workers' compensation credit. Accordingly, defendants shall pay to plaintiff in a lump sum as compensation for temporary and permanent partial disability in the amount of $32,492.78, less $8,123.20 which shall be paid to plaintiff's attorneys as they may direct.
4. If plaintiff has not paid an attorney's fee with respect to the third party settlement, he shall be responsible for same up to the sum of $8,333.33, the amount which would have been ordered disbursed by the Commission had this settlement proceeded and had been considered in the normal manner.
5. Defendants shall pay the medical expenses resulting from plaintiff's injury, including future expenses reasonably required to provide plaintiff relief from his injury, when bills for the same have been submitted through the carrier to the Industrial Commission for approval, and approved by the Commission.
6. Defendants shall pay the costs, including an expert witness fee of $200.00 to Dr. Thomas Moore.
IT IS FURTHERMORE ORDERED that this case be REMOVED from the Full Commission docket.
This the __________ day of ________________________, 1994.
 S/ _________________________ J. HOWARD BUNN, JR. CHAIRMAN
CONCURRING:
S/ _________________________ J. RANDOLPH WARD COMMISSIONER
S/ _________________________ JAMES J. BOOKER COMMISSIONER
JHB/nwm 3/09/94